Estate of Harry W. Hammond, Deceased, Citizens National Trust and Savings Bank of Riverside, Trustee of the Harry W. Hammond Trust v. Commissioner.
Estate of Hammond v. Commissioner
Docket No. 45705.
United States Tax Court
T.C. Memo 1954-162; 1954 Tax Ct. Memo LEXIS 83; 13 T.C.M. (CCH) 903; T.C.M. (RIA) 54271; September 29, 1954, Filed Walter L. Nossaman, Esq., 900 Wilshire Boulevard, Los Angeles, Calif., Joseph D. Brady Esq., and James L. Wood, Esq., for the petitioner. Donald P. Chehock, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $136,979.94 in the estate tax of the estate of Harry W. Hammond, deceased. Issues presented by the pleadings are the correctness of the respondent's action (1) in failing to comply with the mandate of section 824, Internal Revenue Code of 1939, when he determined in 1950 that the fair market value of 662 1/4 shares of stock of Riverside Daily Press, held at the time of decedent's death in a trust of which he was grantor, was $302.64 per share and collected *84 a deficiency of $13,635.55 based on that determination, (2) in determining that the optional valuation date as to 39 of the aforementioned 662 1/4 shares of stock was July 3, 1949, and not November 17, 1948, and in determining that the value of the 39 shares under the optional valuation method was $900 per share instead of $200 per share, the price at which the 39 shares were sold on November 17, 1948, (3) in determining that the fair market value of the 662 1/4 shares of stock of Riverside Daily Press was $900 per share, and (4) in failing to allow a deduction for certain expenses which have been and will be incurred in contesting the deficiency involved herein. Petitioner states in its opening brief that it is not asking this Court to decide that respondent's 1950 finding of a value of $302.64 per share was legally final and binding on it. In view of this statement we need not decide the first issue raised by the pleadings. Findings of Fact Some of the facts have been stipulated and are found accordingly. Harry W. Hammond, hereinafter sometimes referred to as the decedent, died on July 3, 1948, a resident of Riverside, California. The decedent died intestate. His entire estate *85 except for a jointly-held bank account was left in trust. The trustee, Citizens National Trust and Savings Bank of Riverside, filed the Federal estate tax return with the collector of internal revenue at Los Angeles, California. The trustee elected to have the gross estate of the decedent valued in accordance with values as of a date or dates subsequent to the decedent's death, as provided in section 811(j), 1939 Code. On October 15, 1930, Harry W. Hammond and his then wife, Maude T. Hammond, transferred in trust to the Citizens National Trust and Savings Bank of Riverside certain real and personal property, including 642 shares of stock of the Riverside Daily Press, sometimes hereinafter referred to as Press. The trust instrument provided, inter alia, as follows: "The entire net income received from the trust estate and available for distribution shall be paid in quarterly or other convenient installments to the Trustor, HARRY W. HAMMOND, during the period of his natural life. * * *
"The Trustors, during the life of HARRY W. HAMMOND, have reserved the absolute power of appointment and disposition of the principal and income of the trust estate after the decease of the *86 said HARRY W. HAMMOND, to be exercised not by Will, but only by the last unrevoked written instrument exercising such power and on file with the Trustee at his death. Such power may be so exercised from time to time, and each exercise thereof may be similarly revoked. * * *
"In the exercise of the powers mentioned in the preceding paragraph VII, the Trustee shall act at all times jointly with the written approval of HOWARD HAYS, during his lifetime, unless the said HOWARD HAYS (HWH) shall give the Trustee written notice of his refusal to act in such advisory capacity. In the event of the refusal or inability of the said HOWARD HAYS to act in such advisory capacity, the Trustee shall act, under the same conditions, upon the written approval of WILLIAM A. JOHNSON, now of Alhambra, California. Should the Trustee at any time submit to such co-advisors, or either of them, a request for approval of the Trustee's exercise of powers, and the said co-advisors or either of them shall refuse to either approve or disapprove thereof within thirty (30) days of submission to them of the said request, the Trustee shall thereupon act upon the proposed action submitted, in its own discretion. *87 "The whole title, legal and equitable, in fee, to the trust estate is and shall be vested in the Trustee as such title in the Trustee is necessary for its due execution of this trust. * * * "The Trustor, HARRY W. HAMMOND, has reserved until his death or until he shall surrender it to the Trustee, or until legally declared incompetent, the exclusive possession and use, without rental or other accounting therefor to the Trustee, of the real and tangible personal property of the trust estate, and the exclusive management and control of all other property of the trust estate. * * *
"The Trustor, HARRY W. HAMMOND, at any time, with the written consent of the Trustee, but not otherwise, may add to this trust other property, which, upon acceptance thereof by the Trustee, shall become a part of the trust estate to be held in trust under all the terms hereof. * * *
"The Trustor, HARRY W. HAMMOND, during his lifetime, may, without the consent of or notice to any beneficiary, by written instrument filed with the Trustee and upon paying any sums due the Trustee and releasing it from and assuming all obligations affecting the Trustee and the trust estate or any part thereof *88 withdrawn, and indemnifying the Trustee to its satisfaction against any liabilities incurred by it in administering this trust, revoke it in whole or in part and/or may withdraw any or all of the trust estate, and the Trustee shall transfer and deliver the property affected thereby to the Trustor, HARRY W. HAMMOND; and the Trustors or HARRY W. HAMMOND may likewise, but only with the written consent of the Trustee, amend this trust without limitation, amend or cancel any amendments, and limit or divest the rights of any or all beneficiaries. Except as herein provided, this trust shall not be terminated by the beneficiaries hereunder nor by any court nor otherwise, prior to the expiration of its full term as herein fixed." On October 6, 1933, an amendment was made to the trust which substituted Myrtle G. Hammond as the trustor's wife in place of his deceased wife, Maude T. Hammond. Among other provisions, the amendment contained the following: "The following is a list of the assets comprising the corpus of said Declaration of Trust #40, as of the date of my marriage to MYRTLE G. HAMMOND, and also as of September 30th, 1933. I hereby ratify and confirm my former instructions to you *89 not to register or change the titles thereto to the Trustee until my death or until instructed to do so by me. These instructions, however, shall not in any way affect the validity of the title in the Trustee, as it is the intent of both Trustor and Trustee that title to the various assets of the trust estate shall be vested in the Trustee." Thereafter, in this amendment of 1933, follows the list of property, including 551 shares of the stock of Press. At the end of the amendment appears the written acceptance of the trustee to the provisions of the amendment. The acceptance is dated November 6, 1933. Arthur A. Culver married Hammond's daughter, Barbara Hammond, in 1935. Thereafter, on June 27, 1936, a second amendment was made to the trust, substituting Culver as the advisor to the trustee, in place of Howard Hays. Here again at the end, pursuant to the requirements of the trust, the trustee executed in writing its acceptance of the terms of this second amendment. The corpus of the trust constitutes taxable property of decedent's estate. The gross estate as reported in the Federal estate tax return included 662 1/4 shares of stock of Press. Press is a California corporation *90 incorporated December 13, 1922. Its principal place of business is at Riverside, California, about 53 miles east of Los Angeles. The operation of Press consisted primarily of the publication and circulation in Riverside County of a daily morning and evening newspaper with a single morning edition on Sunday. At the time of decedent's death Press published the only daily newspaper published in the city of Riverside. Daily and Sunday newspapers were brought into Riverside from Los Angeles and there were weekly newspapers in the immediate area. Press also, in leased premises, operated a commercial printing and photoengraving division or department (not separately incorporated) known as Rubidoux Printing Company. The main part of the Rubidoux division was devoted to photoengraving work incident to the publication of the Press newspapers. The capitalization of Press consisted of 1,500 shares of capital stock of $100 par value per share, authorized, issued and outstanding. Press had no preferred stock and no funded debt. Prior to 1932, Press published the newspaper known as the "Press" and the Riverside Enterprise Corporation published another paper known as the "Enterprise." The Enterprise *91 corporation was owned 50 per cent by the Sun Company of San Bernardino and 50 per cent by Press. The publication of the "Enterprise" was not a profitable venture. After some negotiations, a merger of the two corporations took place, with the Enterprise corporation being dissolved. After the merger, in 1932, the 1,500 shares of stock of Press were owned as follows: Harry Hammond
550.833
Dr. E. P. Clarke
308.466
Arthur F. Clarke
252.06
The Sun Company of San Bernardino,
California, a corporation
178
A. A. Piddington
155.999
Howard H. Hays
35.253
Louis H. Clarke
13.22
Maude T. Hammond
6.169
At the meeting at which the merger was agreed upon, R. C. Harbison, Harry S. Webster and James A. Guthrie represented the Sun Company. Inquiry was made by Hammond as to what the Sun Company intended to do with its 178 shares. All three officers of the Sun Company agreed they desired to keep them. It was then orally agreed by Harbison, Webster and Guthrie that if a sale were to be made of the 178 shares, they would first offer them to Press stockholders. If the Press stockholders were unwilling to pay the price Harbison, Webster or Guthrie asked for the shares, then *92 the latter were free to sell the 178 shares to others. Hammond, at or about the same time, also agreed to assist Hays in acquiring the stock of other stockholders so that the Hammond and Hays interests would be the same. The 178 shares were distributed by the Sun Company to its stockholders about 1934 or 1935, with Harbison receiving 89 shares and Guthrie and Webster 44 1/2 shares each. In 1937, Ida M. Harbison, the wife of Harbison, acquired under his will the 89 shares he had owned. The will contained no provision restricting her in the use or sale of the shares. Prior to 1935, Dr. E. P. Clarke was the editor of the newspaper, A. A. Piddington was city editor, and Hammond was the business manager. Dr. Clarke was the president of the company and Hammond was the vice-president. In 1935, Dr. Clarke died and Hammond succeeded him as president of the company, with Howard H. Hays becoming vice-president. From the early 1930's to July 3, 1948, Hammond, Hays and Guthrie were directors of Press. Hammond was born in 1867 and was 81 when he died. He had been one of the owners of Press since 1899. He was on the Riverside Board of Public Utilities and had been a bank director, president of *93 the Rotary Club and president of the Chamber of Commerce. He was conservative in his financial policy and maintained that Press never borrow money for its operations. All of the company's capital, except that originally paid in for stock, arose from its earnings. In 1937 Hammond suffered a serious heart attack and he and Hays decided it was time for the company to employ a younger man waho wouldwho would gradually take over management of the company's affairs. Arthur A. Culver, son-in-law of Hammond, was employed in April 1937 to assume the contemplated role. Prior to the time Culver joined Press he had been employed in a security-brokerage firm in Riverside at approximately $4,000 per year. He was employed by Press at $75 per week, or approximately the same salary he had been receiving. At the time Culver was employed he asked Hammond if he could look forward to owning some stock of Press, and Hammond told him he would sell him some stock for $200 per share. Culver occupied the dual capacity of advertising manager and assistant to Hammond. His duties were heavy from the start, with all of his available time being used to study closely all phases of the business. A number of changes *94 were made in the operation of the company by Culver. Included in the changes were the raising of the circulation rate; the changing from an agency system of selling newspapers to an office control employment system; the substituting of mail service for carrier service in a few areas; the increasing, at various times, of the advertising and subscription rates; and the dropping of the International News Service and Associated Press and the retaining of the United Press news service only. As planned, Culver graudually took over substantially all of Hammond's duties until he reached the point where, as business manager, he assumed supervision of all departments of the organization. For a number of years prior to Hammond's death, Culver was the active head of the paper, consulting with Hammond and Hays only on major purchases or policy matters. In 1949 Culver was elected president of the Chamber of Commerce of Riverside. Howard H. Hays, Jr., became assistant editor of Press in 1946 and editor in the fall of 1949. He was a graduate of Stanford University, of Harvard Law School, and prior to coming to Press had served 3 1/2 years with the Federal Bureau of Investigation, and approximately *95 a year as a reporter for the San Bernardino Sun. Prior to Hammond's death, Howard H. Hays, Jr., was delegated virtually complete control of the editorial department of the newspaper. The members of the board of directors of Press were as follows on the indicated dates: On July 3, 1948
On July 3, 1949
Howard H. Hays
Howard H. Hays
James A. Guthrie
James A. Guthrie
Arthur A. Culver
Arthur A. Culver
Harry W. Hammond
Richard B. Hampson
Howard H. Hays, Jr.
Howard H. Hays, Jr.
Arthur A. Culver and Howard H. Hays, Jr., became directors in 1940 and 1946, respectively. Richard B. Hampson, president of Citizens National Trust and Savings Bank of Riverside, was elected a director on November 23, 1948, to fill the vacancy created by the death of Harry W. Hammond. The officers of Press were as follows on the indicated dates: On July 3, 1948 Harry W. Hammond, President and Treasurer, Howard H. Hays, Vice-President, Arthur A. Culver, Secretary On July 3, 1949 Howard H. Hays, President and Treasurer, Arthur A. Culver, Vice-President, Howard H. Hays, Jr., Secretary In 1942 Harry S. Webster notified Hays and Hammond that he wished to sell his 44 1/2 shares *96 of Press stock. Hammond, Hays and Culver conferred on the matter and decided $200 per share was a fair price for the stock. Negotiations were then had between Culver and Webster regarding a $200 price per share. On October 6, 1942, a purchase was consummated, with Webster selling his 44 1/2 shares to Hammond, Hays and Hays' wife $200for per share. On or about June 3, 1943, Hammond executed, first in longhand, and then by a typed instrument, the following: "AMENDMENT "CITIZENS NATIONAL TRUST AND SAVINGS BANK OF RIVERSIDE, TRUSTEE FOR HARRY W. HAMMOND, Riverside, California
"Gentlemen: "At any time after you assume management of my Trust Estate, and provided you hold therein more than fifty (50) shares of Common Stock of the RIVERSIDE DAILY PRESS, I hereby authorize you to sell to ARTHUR CULVER fifty (50) shares thereof at a price of TWO HUNDRED ($200.00) DOLLARS per share. "Such sale to him shall be in such amounts and at such terms as he may desire. "Dated at Riverside, California, this 3rd day of June, 1943. "Respectfully, "/s/ Harry W. Hammond Trustor" The above instrument does not bear the written acceptance of the trustee. On June 3, 1943, or shortly thereafter, *97 Hammond, out of shares he held personally, sold Culver 4 shares for $800, the 4 shares to be considered part of the 50 shares referred to in the above mentioned instrument of June 3, 1943. Later, on or about March 12, 1946, Hammond, out of shares he then held personally, sold Culver an additional 7 shares for $1,400. Subsequent to Hammond's death on July 3, 1948, and on November 17, 1948, the trustee transferred 38 shares to Arthur A. Culver and 1 share to Richard B. Hampson, Culver paying $7,800 for the 39 shares. The stockholders of Press were as follows on the indicated dates: Number of shares
July 3,
July 3,
Per-
Name of Stockholder
1948
1949
centage
Howard H. Hays family: Howard H. Hays
313 1/4
313 1/4
Margaret M. Hays (wife of Howard H. Hays)
307
307
Howard H. Hays, Jr. (son of Howard H. and
20
20
Margaret)
Daniel M. Hays (son of Howard H. and Margaret)
20
20
William H. Hays (son of Howard H. and Margaret)
20
20
Total
680 1/4
680 1/4
45.28%
Harry W. Hammond family: Harry W. Hammond or his trust
662 1/4
623 1/4
Myrtle G. Hammond (wife of Harry W. Hammond)
4
4
Barbara J. Culver (daughter of Harry W.
3
3
Hammond)
Arthur A. Culver (husband of Barbara)
11
49
Richard B. Hampson (owned beneficially by
1
Culver)
Total
680 1/4
680 1/4
45.28%
Other: James A. Guthrie (Editor and Publisher of the
San Bernardino,
California, Sun-Telegram)
44 1/2
44 1/2
Ida M. Harbison (widow of former officer of the
San Bernardino
Sun Company)
89
89
Citizens National Trust & Savings Bank of
Riverside, Trustee
under Will of A. A. Piddington, former officer
of Riverside
Daily Press
6
6
Total
139 1/2
139 1/2
9.44%
Total shares outstanding
1,500
1,500
100.00%
*98 Both before and after the death of Harry Hammond there was an understanding between the members of the Hays family and the members of the Hammond family that they would maintain equal interests in Press, and that if additional shares of the corporation became available they would be purchased in equal amounts so that equality of interests would remain. The agreement was one of long standing and was first entered into between Hays, Sr., and Hammond. After the death of Hammond, Hays, Sr., regarded Culver as the spokesman for the Hammon family. Hays, Sr., and Culver have had very friendly business relations. The following schedule shows the average net paid daily circulation of each publication of Press by years: AVERAGE NET PAID DAILY CIRCULATION
Morning
Sunday
12 months
Combined
Evening
Enter-
Enter-
Year
ending
Daily
Daily Press
prise [1]
prise
1926
Mar. 31
6,345
6,345
1927
June 30
6,851
6,851
1928
June 30
7,162
7,162
1929
June 30
7,084
7,084
1930
June 30
7,182
7,182
1931
Sept. 30
7,213
7,213
1932
Sept. 30
6,635
6,635
1933
Sept. 30
6,856
3,138
(6 mos.
Mar. 31)
1934
Sept. 30
10,105
6,993
3,112
3,161
1935
Sept. 30
10,377
7,164
3,213
3,262
1936
Sept. 30
10,663
7,157
3,506
3,554
1937
Sept. 30
10,983
7,099
3,884
3,923
1938
Sept. 30
11,689
7,394
4,295
4,332
1939
Sept. 30
12,343
7,639
4,704
4,738
1940
Sept. 30
12,057
7,520
4,537
4,562
1941
Sept. 30
12,565
7,768
4,797
4,839
1942
Sept. 30
13,261
8,216
5,045
5,112
1943
Sept. 30
14,956
9,647
5,309
5,382
1944
Sept. 30
16,660
11,138
5,522
5,561
1945
Sept. 30
17,977
11,785
6,192
6,159
1946
Sept. 30
18,891
12,339
6,552
6,450
1947
Sept. 30
19,920
13,286
6,634
6,536
1948
Sept. 30
20,672
13,804
6,868
6,878
2 quarters ending
21,241
14,018
7,223
7,387
June 30, 1949
*99 The following schedule shows the population of the city of Riverside, the net paid week-day circulation, and advertising linages: Population
Net paid
of city of
week-day
Advertising
Year
Riverside
circulation
linages
1926
26,750
6,345
1927
27,650
6,851
1928
28,700
7,162
1929
7,084
1930
30,696
7,182
1931
31,749
7,213
611,064
1932
32,508
6,635
488,489
1933
32,982
9,994
429,546
1934
32,526
10,105
457,000
1935
33,156
10,377
497,267
1936
34,146
10,663
569,736
1937
35,179
10,983
559,836
1938
36,166
11,689
503,679
1939
37,491
12,343
506,625
1940
38,227
12,057
530,782
1941
37,678
12,565
550,469
1942
41,581
13,261
515,992
1943
46,791
14,956
614,064
1944
59,169
16,660
746,292
1945
51,830
17,977
930,428
1946
48,228
18,891
921,818
1947
50,324
19,920
1,222,500
1948
50,700
20,672
1,352,149
6/30/49
21,301
668,889
The following schedule shows the total operating income, net profit per books before taxes, Federal income and excess profits taxes, net profit after taxes, net profit per share, and dividends paid per share *100 by Press by years: Net profit
Net profit
per
per
books
Federal
share
before
(1,500
Federal
income and
Net
shares of
Dividends
Total
income and
excess
profit
capital
paid
stock
operating
excess
profits
after
outstanding
per
profits
Year
income
taxes
taxes
taxes
at all
share
times)
1926
$ 53,024.17
$ 6,379.58
$ 46,644.59
$ 31.10
$ 20.66
1927
49,001.57
5,821.12
43,180.45
28.79
22.00
1928
60,388.14
6,487.73
53,900.41
35.93
33.33
1929
64,931.21
6,436.21
58,495.00
39.00
33.33
1930
65,113.04
7,074.66
58,038.38
38.69
37.33
1931
49,642.45
5,333.24
44,309.21
29.54
16.00
1932
30,401.41
3,035.76
27,365.65
18.24
8.33
1933
21,600.40
3,095.88
18,504.52
12.34
8.00
1934
36,757.49
5,037.30
31,720.19
21.15
25.00
1935
49,111.72
7,003.80
42,107.92
28.07
25.00
1936
64,188.72
12,028.94
52,159.78
34.77
20.00
1937
39,570.80
6,422.10
33,148.70
22.10
18.00
1938
31,590.67
5,284.67
26,306.00
17.54
10.00
1939
$ 252,057.00
30,139.90
5,990.02
24,149.88
16.10
10.00
1940
269,177.00
40,993.81
9,634.24
31,359.57
20.91
16.00
1941
281,805.00
42,856.48
13,706.30
29,150.18
19.43
8.00
1942
294,332.00
49,779.62
20,730.32
29,049.30
19.37
14.00
1943
372,065.00
79,006.63
47,974.08
31,032.55
20.69
16.00
1944
467,874.00
157,381.80
97,058.92
60,322.88
40.22
26.00
1945
535,459.00
126,959.23
84,307.30
42,651.93
28.43
14.00
1946
648,016.00
200,488.92
76,457.93
124,030.99
82.69
16.00
1947
887,417.00
280,916.68
106,810.73
174,105.95
116.07
16.00
1948
1,021,134.00
264,647.25
100,107.27
164,539.98
109.69
16.00
6 mos.
ended
6-30-49
517,411.00
135,948.39
50,685.45
85,262.94
56.84
8.00
*101 The following are the condensed comparative balance sheets of Press at December 31, 1945, 1946, 1947, 1948 and June 30, 1949: 1945
1946
1947
ASSETS LESS LIABILITIES -
Cash
$ 57,340.00
$124,109.00
$169,670.00
U.S. Government securities, at cost
less premiums amortized
120,255.00
112,000.00
177,000.00
Other marketable securities, at cost
60,758.00
61,994.00
68,049.00
Trade accounts receivable
52,735.00
84,677.00
104,389.00
Inventories
13,152.00
16,301.00
20,472.00
Prepaid expenses
1,553.00
1,138.00
2,960.00
Total current assets
$305,793.00
$400,219.00
$542,540.00
Trade accounts payable
$ 7,214.00
$ 10,834.00
$ 11,716.00
Federal income and excess profits
tax liability as finally determined
87,216.00
88,264.00
106,811.00
Accrued liabilities
8,635.00
11,992.00
13,222.00
Total current liabilities
$103,065.00
$111,090.00
$131,749.00
Working capital
$202,728.00
$289,129.00
$410,791.00
Buildings, at cost or other federal
income tax basis
$ 48,101.00
$ 48,251.00
$ 49,805.00
Equipment, at cost or other federal
income tax basis
53,449.00
57,559.00
93,009.00
Total depreciable assets
$101,550.00
$105,810.00
$142,814.00
Less: Accumulated depreciation
47,451.00
45,012.00
56,688.00
Net depreciable assets
$ 54,099.00
$ 60,798.00
$ 86,126.00
Land, at cost or other federal in-
come tax basis
23,333.00
23,333.00
23,333.00
Total fixed assets - net
$ 77,432.00
$ 84,131.00
$109,459.00
Other assets - securities held for
trade purposes, at cost
$ 3,175.00
$ 3,175.00
$ 9,025.00
Trust deeds and loans receivable -
employees and shareholders
22,847.00
28,875.00
28,088.00
Miscellaneous assets
2,041.00
2,944.00
997.00
Total other assets
$ 28,063.00
$ 34,994.00
$ 38,110.00
Total net assets
$308,223.00
$408,254.00
$558,360.00
CAPITAL STOCK AND SURPLUS -
Surplus - beginning of period
$136,571.00
$158,223.00
$163,089.00
Net profit for period
42,652.00
124,031.00
174,106.00
Total
$179,223.00
$282,254.00
$337,195.00
Dividends paid
( 21,000.00)
( 24,000.00)
( 24,000.00)
Transfer to reserve for building
( 95,165.00)
Surplus - end of period
$158,223.00
$163,089.00
$313,195.00
Reserve for building
95,165.00
95,165.00
Capital stock outstanding -
1500 shares
150,000.00
150,000.00
150,000.00
Total capital stock and surplus
$308,223.00
$408,254.00
$558,360.00
*102 June 30,
1948
1949
ASSETS LESS LIABILITIES -
Cash
$186,039.00
$184,844.00
U.S. Government securities, at cost
less premiums amortized
152,000.00
202,115.00 [1]
Other marketable securities, at cost
110,367.00
110,209.00 [1]
Trade accounts receivable
119,661.00
109,045.00
Inventories
33,357.00
25,865.00
Prepaid expenses
3,605.00
4,343.00
Total current assets
$605,029.00
$636,421.00
Trade accounts payable
$ 22,486.00
$ 9,545.00
Federal income and excess profits
tax liability as finally determined
100,107.00
100,533.00
Accrued liabilities
10,310.00
21,659.00
Total current liabilities
$132,903.00
$131,737.00
Working capital
$472,126.00
$504,684.00
Buildings, at cost or other federal
income tax basis
$ 80,151.00
$ 81,641.00
Equipment, at cost or other federal
income tax basis
147,090.00
193,587.00
Total depreciable assets
$227,241.00
$275,228.00
Less: Accumulated depreciation
61,906.00
69,857.00
Net depreciable assets
$165,335.00
$205,371.00
Land, at cost or other federal in-
come tax basis
23,333.00
23,333.00
Total fixed assets - net
$188,668.00
$228,704.00
Other assets - securities held for
trade purposes, at cost
$ 9,025.00
$ 9,025.00
Trust deeds and loans receivable -
employees and shareholders
27,661.00
24,842.00
Miscellaneous assets
1,420.00
4,908.00
Total other assets
$ 38,106.00
$ 38,775.00
Total net assets
$698,900.00
$772,163.00
CAPITAL STOCK AND SURPLUS -
Surplus - beginning of period
$313,195.00
$453,735.00
Net profit for period
164,540.00
85,263.00
Total
$477,735.00
$538,998.00
Dividends paid
( 24,000.00)
( 12,000.00)
Transfer to reserve for building
Surplus - end of period
$453,735.00
$526,998.00
Reserve for building
95,165.00
95,165.00
Capital stock outstanding -
1500 shares
150,000.00
150,000.00
Total capital stock and surplus
$698,900.00
$772,163.00
*103 The net assets per books of the corporation (with no amount included therein for good will) and the net book value per share for the years 1937 to June 30, 1949, are as follows: Net assets
Book value
Year
(per books)
per share
1937
$205,200
$136.80
1938
216,506
144.33
1939
225,656
150.44
1940
233,016
155.34
1941
250,166
166.78
1942
258,215
172.14
1943
265,248
176.83
1944
286,571
191.05
1945
308,223
205.48
1946
408,254
272.17
1947
558,360
372.24
1948
698,900
465.93
June 30, 1949
772,163
514.78
In May 1944 the board of directors of Press gave consideration to the building of a new plant or the enlarging of the present building. Decision was made to enlarge and improve the present plant. As a consequence, real estate acquired in 1936 or thereabouts as a possible building site was sold, and a program of expansion of the existing plant inaugurated. In 1945 the board of directors estimated new presses and housing for them would cost $100,000 to $200,000. In November 1948 James A. Guthrie *104 advised the directors of Press that the Sun Company in San Bernadino had erected a new building for approximately $250,000. The directors thought a similar structure might well be the company's eventual objective and that a new building reserve should be accumulated with such expenditure as an objective. Press had not purchased any land on which to erect a new building on July 3, 1949. From January 1, 1945 to June 30, 1949, $50,128.87 was spent by way of additions and improvements to the then existing building, and $146,252.74 for new machinery and equipment. Included in the new machinery and equipment was a large press, acquired at a cost of $77,000, installed in early 1949, with a capacity of printing 40,000 16-page newspapers per hour. The new press and older press were hooked in tandem, and so connected had the capacity to print 22,000 newspapers of 32 pages per hour. Press operates an open shop. The effect of the nonunionization was to make its wage scale below the average of most other newspapers. The following schedule shows officers' salaries of Press for the period January 1, 1939 to June 30, 1949: A.A.
Harry
Howard
James A.
Arthur
Pid-
Howard
H.
A.
H.
Year
Hammond
Hays
Guthrie
Culver
dington
Hays,
Total
Jr.
1939
$ 3,600
$ 2,400
$ 1,080
$1,200
$ 8,280
1940
6,600
4,400
1,580
1,225
13,805
1941
6,600
4,800
1,500
1,600
14,500
1942
6,600
4,800
915
1,800
14,115
1943
6,600
4,800
720
900
13,020
1944
6,600
4,800
720
$ 4,236
16,356
1945
10,920
7,760
900
8,360
27,940
1946
12,920
8,760
1,500
9,360
32,540
1947
12,920
8,760
1,500
9,430
$ 2,600
35,210
1948
3,960 [1]
8,260
1,500
10,200
7,800
31,720
Six months
ended June
30, 1949
2,880
450
4,100
2,650
10,080 [2]
Total
$77,320
$62,420
$12,365
$45,686
$6,725
$13,050
$217,566
officers'
salaries
*105 In the decedent's estate tax return the 662 1/4 shares of stock in Press held in the trust created by him were included in the gross estate at a value, as of the date of death, July 3, 1948, of $297.96 per share, or in the total amount of $197,324.01, and at the value under the optional date, July 3, 1949, of $236.45 per share, or in the total amount of $156,586.81. In determining the deficiency involved herein, the respondent determined the value of the stock on July 3, 1949, was $900 per share, or an aggregate amount of $596,025. The value at the time of decedent's death of the said 662 1/4 shares of stock in Press $550was per share, or a total value of $364,237.50. Opinion The first issue for our consideration is whether the 39 shares of stock in Press which were sold by the trustee to Culver at $200 per share in November 1948 are *106 to be valued in the gross estate at their fair market value, as respondent contends, or are to be valued according to an option agreement which petitioner contends existed between decedent and Culver, his son-in-law. In support of its contention, petitioner urges that by the instrument of June 3, 1943, the decedent gave Culver an option to purchase up to 50 shares of Press stock at $200 per share and that acting pursuant to such option the trustee sold the 39 shares to Culver at the option price of $200, and that, in view of this, the situation here is governed by the principle that where stock is held at decedent's death subject to an enforceable option to buy at a specified price, the fair market value of the stock for estate tax purposes can not exceed the option price. Wilson v. Bowers, 57 Fed. (2d) 682; Lomb v. Sugden, 82 Fed. (2d) 166; Commissioner v. Bensel, 100 Fed. (2d) 639; Commissioner v. Childs' Estate, 147 Fed. (2d) 368; Estate of Albert L. Salt, 17 T.C. 92; and May v. McGowan, 97 Fed. Supp. 326, affd. 194 Fed. (2d) 396. Respondent contends that no enforceable contract was *107 made because, first, the instrument of June 3, 1943, executed by the decedent did not constitute an effective amendment to the trust agreement since the trustee did not give its necessary consent to the amendment; secondly, Culver gave Hammond no consideration for any agreement to sell him stock and, therefore, mutuality of obligation, an essential element to the formation of a contract, was lacking; and, thirdly, in view of the fact that decedent could have revoked the trust provisions at any time during his life, all trust property is includible at its fair market value under section 811(c) and (d) of the Internal Revenue Code of 1939. Our first problem is to determine whether the 39 shares of Press stock were subject to an enforceable option. The trust that Hammond set up provided that "the Trustors or HARRY W. HAMMOND may likewise, but only with the written consent of the Trustee, amend this trust without limitation * * *." The obvious purpose of a provision requiring the written consent of the trustee to any amendment of the trust was to give the trustee an opportunity to be informed of its duties and to permit it to refuse to agree to any amendment which it considered undesirable *108 from its standpoint. Petitioner urges that since Hammond sold Culver 4 shares of stock of Press in 1943, it was unnecessary for the trustee to consent to the amendment. Petitioner's contention is that Hammond was bound by the oral contract made with Culver in 1937 but was not obligated to abide by the terms of the trust agreement which he entered into in 1930. How petitioner arrives at such an ingenious conclusion is not explained. Since Hammond created the trust and the trustee had given its written consent to two previous amendments, he certainly knew of the trust requirements. Culver also knew of the requirements, as he was an advisor to the trustee. The record shows that two amendments were made to the trust agreement, one on November 6, 1933, and another on June 27, 1936. Each was accepted in writing by the trustee. In view of this, and in the absence of evidence showing that the provision of the trust instrument, requiring that amendments could be made only with the written consent of the trustee, had been abrogated by the parties, we think that the instruction given to the trustee by Hammond in the instrument of June 3, 1943, which was never accepted in writing by the trustee, *109 was ineffective as an amendment to the trust and did not bind the trustee to sell the 39 shares or any other number to Culver at the price of $200 per share or any other amount. Since the trustee was not bond to sell any shares at any price, there was no agreement enforceable against it. That fact distinguishes the instant case from the aforementioned cases relied on by petitioner, wherein the agreements there involved were binding on the estates to sell the stock after the death of the grantor of the option. The trust agreement provided in paragraph VII that the trustee could sell any part of the trust estate it deemed advisable. The sale of the shares made by the trustee to Culver in November 1948 following the decedent's death apparently was made under the general power to sell granted by the trust agreement. The instrument of June 3, 1943, is further distinguishable from those involved in the cases cited by petitioner. Under paragraph IX of the trust agreement, Hammond had the power until his death to dispose of any trust property or to revoke the trust. The direction to the trustee contained in the instrument of June 3, 1943, was "provided you hold therein more than fifty *110 (50) shares of Common Stock of the RIVERSIDE DAILY PRESS, I hereby authorize you to sell * * *." Assuming, arguendo, that the amendment was binding upon the trustee, the restriction imposed upon the property by the option did not actually become effective until decedent's death. Hammond could sell the stock at any time up until he died at any price he could obtain. This agreement merely gave to Culver the right to buy 50 shares provided Hammond's estate owned them at the time of his death. The agreement, therefore, was testamentary in character. See Estate of James H. Matthews, 3 T.C. 525. In the cases which petitioner cites, the restriction upon the sale of the property became effective during the decedent's lifetime and the value of the property was not affected by his death. In view of petitioner's selection of the optional valuation date of July 3, 1949, for valuing the gross estate, it has been suggested that the 39 shares of Press stock should be valued on the basis of the sale made November 17, 1948, at $200 per share. This argument has no merit, as it is obvious that the trustee was making a sale to the son-in-law which it would not have made to any other person *111 in a bona fide arm's length transaction. We, therefore, conclude the 39 shares are to be valued at their fair market value in the same manner as the 623 1/4 shares which were not sold. The second issue relates to the value of 662 1/4 shares of stock in Press. The petitioner elected to value the property of the estate under section 811(j) of the 1939 Code, and reported the 662 1/4 shares of stock as having a value of $236.45 per share. In determining the deficiency the respondent increased the value of each share to $900. From a careful consideration of all of the evidence bearing on the value of the 662 1/4 shares of Press stock here involve, including the asset value per share of the stock, the earnings and dividend records of Press, the prospects for the future, and the opinion testimony of witnesses, we are of the opinion that the stock had a value of $550 per share or a total value of $364,237.50 on the critical date, and have so found as a fact. The last issue involves the deductibility of expenses which have been and will be incurred in contesting the present deficiency. No mention of any additional expenses incurred was made during the trial by petitioner. However, Rule *112 51 of this Court makes provision for the deduction of these additional expenses. We conclude that the parties will settle the matter under Rule 50. Decision will be entered under Rule 50. Footnotes
1. Press acquired the Enterprise during 1932.↩
1. The market value at July 1-5, 1949, of the U.S. Government securities and other marketable securities of $312,324 was $309,523.↩
1. The $3,960 excludes bonus of $2,500 paid to the estate of Harry W. Hammond in December of 1948. If this item were included the total would be $6,460. ↩
2. The $10,080 total does not include any part of the bonus of $3,000 paid to Howard H. Hays, Jr., nor the bonus of $3,000 paid to Arthur A. Culver in December of 1949 for the year 1949.↩